## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SCOTT CURTIS,

        *Plaintiff*,

vs.

       Case No. 21-1010-EFM

VIEGA, INC. and VIEGA, L.L.C.,

        *Defendants*.

## MEMORANDUM AND ORDER

Scott Curtis alleges he was injured when he was operating a forklift on the property of Defendant Viega L.L.C. and its parent company, Viega, Inc.  Both Defendants have moved for summary judgment.  Viega L.L.C argues it is not liable under the circumstances of the case, as the danger presented by a low-clearance mezzanine was open and obvious.  Viega, Inc. argues that it is not legally responsible for the premises owned and operated by its subsidiary.  The Court denies relief to Viega, L.L.C., and grants summary judgment to Viega, Inc.

## I.      Factual and Procedural Background

Defendant Viega, L.L.C. is the sole owner and operator of a manufacturing and distribution facility in McPherson, Kansas.  Viega leases several forklift trucks from Heubel

Material Handling. Under their contract, Heubel also provides forklift repair and maintenance services to the owner of the facility.

Plaintiff has been employed as a certified Forklift Service Technician for Heubel since January 21, 2010. In addition to operating and driving forklifts, Plaintiff maintains them. He is certified to maintain, operate, and drive Raymond reach forklift trucks. Before working for Heubel, Plaintiff was also a certified forklift service technician for Exide Corp. for about five years.

To obtain this certification, Plaintiff attended a two-day training course and attended yearly safety training prior, where he was trained to operate forklift trucks at safe speeds, be aware of the environment and surroundings, and recognize obstructions such as doorways and walkways. He knows that to safely drive a forklift, he must always look where he or she is going and keep a clear view, drive at a speed that is safe for the conditions, avoid striking objects overhead (like pipes, sprinkler heads, ducts, elevator gates, and overhead doors), watch out for objects sticking out from racks, shelves and walls, and pay attention to his operating environment.

Heubel trains its forklift service technicians to look for low clearances when going into a facility. Plaintiff trained Heubel employees on forklift maintenance and operation. He was one of Heubel's more experienced forklift service technicians.

Plaintiff testified that the first thing he does when he visits a facility is to locate the supervisor to identify the location of the forklift truck because it is "not professional" to "just go wandering around blindly in somebody's facility." He is "constantly looking all the time" for hazards or obstructions and notices things that "an average person wouldn't notice."

- 2 -

At the time of the accident, Plaintiff was at the Viega facility providing forklift maintenance services to Viega on behalf of Heubel. Plaintiff had visited the McPherson facility approximately 50 to 60 times over the years.

Raymond makes forklifts of varying heights. The forklift Plaintiff worked on is 13.3 feet tall when not extended. On December 19, Plaintiff worked on the forklift in the same area of the Logistics department where found it. After finishing the maintenance, he test drove the forklift. Plaintiff testified he operates and test drives the forklifts to check for leaks. He agreed in his deposition that this "can typically be done" in the same area the repair takes place. However, operators may sometimes test drive a forklift into a different area.

On December 19, Plaintiff drove the forklift truck out of the Logistics department to the restrooms located about 70 feet away, near the building mezzanine. In support of its motion, Defendant stresses the deposition testimony of Plaintiff, in which he acknowledged that Viega did not ask him to test drive the forklift away from the repair area in the Logistics department, and that he could have could have walked to the mezzanine area restroom.

While driving the forklift on the way to the restroom, Plaintiff hit the projecting mezzanine wall, which sits about 11.75 feet above the warehouse floor. He was thrown from the truck, and alleges that he sustained serious injuries to his leg, hip, and elbow.

Another Heubel employee, Jose Valencia, witnessed Plaintiff driving. Seeing Plaintiff "wasn't slowing down" as he approached the mezzanine overhang, he yelled at him to stop. The warning, however, came too late. Valencia testified there was only a fraction of a second between when he saw that Plaintiff would strike the mezzanine and the impact. The facility is also loud, with many machines operating.

Valencia testified that Plaintiff did not appear to be keeping watch for pedestrians. He could not recall if there were any pedestrians or other forklifts actually in the area at the time, but he "thought it was odd that he [Plaintiff] did not stop or honk at the intersection." Plaintiff has stated that he was watching for pedestrians, but did not encounter any.

A factual dispute exists as to how Plaintiff was operating the vehicle. Defendant stresses that Heubel's investigation concluded that Plaintiff failed to see the mezzanine because he was not looking in the direction of travel, was not operating at a safe speed, was not aware of his operating environment, and was not aware of obstructions.

Plaintiff testified he was driving the truck as intended, with the forks backward and behind, as they present a large visual obstruction. Valencia also testified that Plaintiff was facing in the appropriate direction. Plaintiff stated he was operating the truck as designed, standing sideways in the operator's compartment and tractor first. "On this specific design of Reach truck," he testified, "you actually have to kind of stand sideways in the operator's compartment."

Immediately after the accident, according to the EMS report, Plaintiff said that the mezzanine must be lower now due to recent construction. Plaintiff also suggests that there had been recent modifications to the facility, but the cited evidence shows only that the building facility had been expanded over the years. The mezzanine itself, located near the middle of the warehouse complex, was included in the original 2009 construction of the facility, and has not been altered since its original construction.

According to Defendant, its forklifts are kept in the Logistics area, because this is the only location in the Facility where the reach forklift trucks are used. There are no mezzanine floors in that area.

Before the accident, Plaintiff knew there was a mezzanine in the warehouse.  Valencia also knew about the mezzanine.  He testified that forklifts are allowed in the general area of the mezzanine, but that forklifts are too tall to go under the mezzanine.

At the time of the accident, a sign hung from the mezzanine:  "CAUTION:  LOW OVERHEAD CLEARANCE."   In his deposition, Plaintiff characterized the sign in his deposition as "little bitty."  Viega testified the sign was visible and obvious.

The sign is shown in two photographs from the investigation.  The first shows the general scene, the second focuses on the sign itself.

 

The warehouse is well lit, clean, and the aisles are wide and open.  Although Plaintiff's response contends there were "floor-level distractions compet[ing] for visual attention," he also

expressly agreed in his deposition that "there was nothing impeding your ability to see [the mezzanine wall]."

It is uncontroverted that there were parking spots for forklifts at the bathrooms near the mezzanine.  Plaintiff has driven other, shorter forklifts in the area where the accident occurred on other occasions without incident.  Valencia testified that forklifts are driven throughout the Viega facility, and that some operate in the area where the accident happened.

Plaintiff knows reach forklifts vary in size, but he understood that "if a truck is in a facility … it's been cleared to run to operate safely throughout the building."  He testified that his training has indicated that if a forklift is within a facility, it is safe to operate through that building unless otherwise marked.

Plaintiff testified that while he intended on using the mezzanine area restroom, his primary purpose in driving the forklift where he did was to test drive it.  He testified he did not know there were restrooms in the Logistics department, and the building does not clearly indicate where one department ends and another begins.

Plaintiff testified that it had been six months to a year since he had been in the Viega facility, and that he did not "often" visit or work at Viega. Visitor logs show that Plaintiff had been in the Viega facility some four months before the accident. As indicated earlier, the Viega facility is very large, and there is no evidence that Plaintiff had previously been in the area of the mezzanine.

Plaintiff testified that other companies mark the floors for forklift use, but that Viega did not use floor level warning signs. He testified that his practice is to operate a forklift after repairing it. How far he drives depends on the nature of the work. He testified he understood the

call to Viega was not for preventative maintenance, but for a specific repair, requiring a test drive.

Most Reach forklift trucks such as the one involved in this accident are driven at five miles per hour, and the top speed is eight miles per hour. Plaintiff does not, generally, ever drive at top speed.  But he acknowledges that he cannot say how fast he was going at the time of the accident.

Before the accident, Plaintiff had never had a forklift driving accident, and had never been disciplined for not following proper procedures.  Valencia had shadowed Curtis after he joined Heubel, and could recall no safety issues or unsafe behavior on his part.  Valencia stated it would be appropriate to test drive a forklift to the bathroom.

Plaintiff testified that when he started working at the Viega campus, reach forklift trucks operated across the site. According to Plaintiff, one doesn't usually look up when driving a forklift, but keeps a watch at eye-level for pedestrians. Plaintiff was aware of one mezzanine floor at the Viega facility, and does not believe the average person would be aware it.

Viega, Inc., a Delaware corporation, is the parent of Viega, LLC.  Viega, Inc. does not own the facility where the accident occurred.  The parties have stipulated that Viega, LLC is the sole owner and operator of the facility.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[1]

---

[1] Fed. R. Civ .P.  56(a).

A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[2]   The movant bears the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[3]   Such a movant "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[4]   The nonmovant must then bring forth "specific facts showing a genuine issue for trial."[5]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[6]   Conclusory allegations are not sufficient to create a dispute as to an issue of material fact.[7]   The court views all evidence and draws "reasonable inferences therefrom in the light most favorable to the non-moving party."[8]

### III.     Analysis

### A.     Viega's Duty of Care

---

[2] *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir.  2017) (emphasis omitted).

[3] *Thom v. Bristol-Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S.  317, 325 (1986))..

[4] *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325)..

[5] *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005).  *See* D. Kan. Rule 7.4.

[6] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[7] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit As''n v. McCurtain Cty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

Negligence is the lack of due care that a reasonable person would exercise under the circumstances.[9]  Under Kansas law, recovery for negligence requires proof of a duty of care.[10] Generally, everyone bears a duty to exercise reasonable care to avoid injuring others.[11] However, a landowner generally does not owe invitees a duty of care to protect against open and obvious dangers.[12]

Assuming Plaintiff was a business invitee,[13] Kansas law required that he "make reasonable use of his faculties for his own protection, and, in the interest of his own safety, . . . to use that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances."[14]

Kansas law employs an "an objective test to determine whether a danger is known and obvious."[15]  The court may take into account the particular knowledge and experience of a plaintiff.[16]  However, in determining whether a risk is open and obvious, the court must assess

---

[9] *Rowell v. City of Wichita*, 162 Kan. 294, 176 P.2d 590, 595 (1947).

[10] *Id*.

[11] *See Striplin v. Kan. Gas & Elec. Co*., 204 Kan. 324, 461 P.2d 825, 828 (1969).

[12] *Manley v. Hallbauer*, 308 Kan. 723, 733, 423 P.3d 480, 487 (2018) ("landowners have no duty to protect against open and obvious dangers [because] individuals have a responsibility to protect themselves from such conditions"); *Miller v. Zep Mfg*., 249 Kan. 34, 815 P.2d 506, 514 (1991) ("Generally, a possessor of land is under no duty to remove known and obvious dangers."); *Scales v. St. Louis-S.F. Ry*., 2 Kan. App. 2d 491, 582 P.2d 300, 306 (1978).

[13] Defendant's motion assumes that Plaintiff was acting as an invitee at the time of the accident, and has reserved for trial the argument that, by going beyond the Logistics department, "Plaintiff had transformed from an invitee to a trespasser."  (Doc. 44, at 8 n. 2).

[14] *Warren v. T.G. & Y. Stores Company*, 210 Kan. 43, 499 P.2d 201, 203 (1972).

[15] *Wellhausen v. University of Kansas*, 40 Kan. App. 2d 102, 189 P.3d 1181, 1184 (2008) (citing § 343A cmt. b).

[16] *See Didde v. City of Champam*, 2012 WL 3822735, at 6 (Kan. Ct. App. 2012) ("Didde's position as an experienced water line worker is therefore relevant" to determining whether "the danger [he] faced was obvious").

"the entirety of the danger."[17]   That is, the court should not "define[] the danger too broadly by focusing only" on the generic type of activity involved, but address the specific danger faced by the plaintiff to determine whether "a fact-finder could reasonably infer [the plaintiff] had not recognized the probability and gravity of the danger."[18]

What constitutes an open and obvious danger will turn on the facts of a given case.  In the leading case of *Miller v. Zep Manufacturing*,[19] the parties agreed that a 10 to 15 foot concrete pit was an open and obvious danger, and the court focused on an exception to the general rule (an exception which is discussed in detail below).  Since *Miller*, most decisions have focused on the exception rather than the rule,[20] and decisions expressly finding a danger was open and obvious involve facts showing a risk was glaringly obvious under the facts.[21]

---

[17] *Gregory v. Creekstone Farms Premium Beef*, 728 F. App'x 824, 828 (10th Cir. 2018).

[18] *Id. See also* Restatement (Second) of Torts § 343A cmt. b. (a danger is open and obvious only if the plaintiff appreciated "the probability and gravity of the threatened harm"); *Lee v. Orion Mgmt. Sol'ns,* 2010 WL 4106696, *9-10 (D. Kan. 2010) (citing § 343A and concluding that "even if Plaintiff had seen the tee marker, it is not clear whether Plaintiff appreciated the *danger* posed by the tee marker before his accident").

[19] 249 Kan. 34, 815 P.d 506, 514 (1991)

[20] *See, e.g., Crowe v. True's IGA*, 32 Kan. App. 2d 602, 85 P.3d 1261, 1266 (2004) ("Crowe's car was located in the middle of the gasoline spill, there was reason to believe that she would fail to protect against the danger of walking through the spill" as she had no other way to retrieve her vehicle).

[21] *See Bonnette v. Triple D. Auto Parts¸* 55 Kan. App. 2d 130, 409 P.3d 865 (2017) ("After using the step approximately 160 times, a reasonable person would recognize the danger associated with the small and awkward step leading to the sidewalk.")*; Didde,* 2012 WL 3822735, at *5 ("[i]t would have been obvious to someone in Didde's position—an experienced water line worker employed by a company hired to make the connection to the dead-end pipe—that the plug might be expelled under pressure if it were loosened"); *Wellhausen,* 189 P.3d at 1184 ("climbing out of a seventh-floor dormitory room window in order to stand upon a 2–foot–wide ledge several feet below the window" is obvious danger); *Walters v. St. Francis Hosp. & Med. Ctr*., 23 Kan.App.2d 595, 932 P.2d 1041, 1045 (1997) ("the possibility of becoming queasy or fainting from witnessing a medical procedure," specifically, the insertion of a nasogastric tube, is obvious).

The Kansas Court of Appeals has observed that "deciding whether a particular condition constitutes a 'known or obvious' danger is generally a factual question reserved for the jury."[22] The Tenth Circuit has recognized that the Kansas Supreme Court has not squarely decided whether the existence of an open and obvious danger is an issue of law or fact.[23]   However, based on the cited Kansas Court of Appeals decision as well as "the approach ordinarily taken elsewhere," it has concluded that the Kansas Supreme Court "would regard the existence of an open and obvious danger as a question of fact."[24]

The court may only "grant summary judgment on the known and obvious danger rule if there [are] no genuine issue as to the material facts."[25]   A danger should not be deemed open and obvious as a matter of law where "the proof simply is not all one way, nor does it overwhelmingly preponderate in [the defendant's] favor so as to permit but one rational conclusion."[26]

Defendant argues that the risk presented by the low mezzanine clearance was open and obvious by singling out just three facts: "(1) a reasonable person would recognize that a 13.3-foot-tall reach forklift truck would not fit under a Mezzanine with a 11.75-foot-tall clearance; (2)

---

[22] *Walker v. Mustang Enters., Inc.*, 2016 WL 3570483, at *3 (Kan. Ct. App. 2016) (per curiam).

[23] *Gregory,* 728 F. App'x at 826.

[24] *Id*. at 826 n. 2 (citing decisions from other states).

[25] *Didde,* 2012 WL 3822735 at *4 (upholding summary judgment where plaintiff failed to "come forward with disputed material facts" which would challenges the trial court's conclusion the danger to "anyone with any experience and knowledge of … waterlines and those types of things, when you notice a plug, and there's no relief valve on it, it's … quite obvious").

[26] *Wheeler v. John Deere*, 935 F.2d 1090, 1105 (10th Cir. 1991). *See also Sholer v. ERC Mgmt. Grp*., 2011 OK 24, ¶ 3, 256 P.3d 38, 40 (2011) ("Whether a defect is open or obvious … presents a question for the trier of fact."); *Grechus v. Trail King Industr*., 2000 WL 35528543, at *4 (W.D. Mo. 2000) (summary judgment was inappropriate because defendant claiming wet ramp was an obvious danger "must prove [plaintiff's] mental state," that is, the plaintiff knew the ramp was wet and consciously chose to face the danger).

it is undisputed that another Heubel technician [Valencia] recognized the danger in doing so; and (3) it should have been obvious to someone with 15-years' experience driving reach forklift trucks."[27]

The Court concludes that a jury question exists as to whether the danger was open and obvious. Although Plaintiff had substantial experience in operating forklifts, Defendant has failed to show how much specific experience Plaintiff had with the taller, extended reach forklifts of the type involved in this accident. The evidence shows that other forklifts were operated in the area of the mezzanine. And, as noted earlier, while the particular expertise of a given invitee may be considered, it is not controlling.[28]

Valencia's testimony is equivocal. He did indeed shout a warning to Plaintiff — but his testimony indicates that he recognized the danger and shouted an instant before the accident. The evidence is that Plaintiff generally drives a forklift at five miles per hour. That Valencia's warning came only moments before the slow-moving forklift actually hit the mezzanine could suggest the danger was not obvious, and was apparent only when the top of the forklift and the mezzanine overhang came in close proximity.

Finally, a rational factfinder might view the actual height differential as relatively minor. The photograph from the investigation file certainly shows that the extended reach forklift does not fit under the mezzanine, but the photograph is taken with the forklift placed immediately in front of the mezzanine. The photograph thus enjoys the benefit of literal hindsight, showing both

---

[27] Doc. 44, at 9.

[28] *See Gregory*, 728 F. App'x at 828-29 (although plaintiff "had experience in delivering cattle and had worked with cattle from a young age," he may not have "appreciated the probability and gravity of the danger" caused specifically by cattle bunching up at a blind alley).

upper extension of the forklift and the mezzanine wall in one view.  As Plaintiff has described

the accident, he was standing sidewise in the forklift cab, facing forward while the upper

extension was to his rear.  Thus, he would not have had the ability to directly see what we see in

the photograph.

The extended reach forklift is approximately 18 inches taller than the mezzanine

overhang, and the clearance was thus 11% less than what the forklift required. It is possible that

the jury might conclude this was not by itself an open and obvious danger, when taken in

conjunction with evidence that other forklifts were used in the area of the mezzanine.[29]


### B.    Could Defendant anticipate a distracted invitee?

Even where a danger is open and obvious, a landowner owes a visitor a duty to warn

visitors who are likely be distracted, to forget, or otherwise fail to protect against the dangerous

condition.  Defendant argues that this exception to the general rule is inapplicable, as it had no

reason for believing that a forklift operator would be distracted or fail to notice the low

mezzanine clearance.

This exception to the general rule was recognized in Kansas in *Miller v. Zep*

*Manufacturing*,[30] and is premised on the Restatement of Torts, which provides:

---

[29] The court addressed a gap of similar magnitude in *Illinois Cent. R. Co. v. Farris*, 259 F.2d 445, 447 (5th Cir. 1958).  The plaintiff, "an experienced truck driver [who] knew that his truck was eleven feet high," was injured when he tried to drive his vehicle under a railroad overpass with clearance which, due to road maintenance "was reduced to nine and a half feet." The railroad argued it had no duty because the danger from the foot and a half difference was obvious.  The court affirmed the jury verdict in favor of the driver, holding that "[t]he danger was not so obvious in this case that the court should have withdrawn the question from the jury." *Id*. at 449.

[30] 249 Kan. 34, 815 P.2d 506, 514 (1991) ("the possessor may be under an affirmative duty to minimize the risk if there is reason to expect an invitee will be distracted, so that he or she will not discover what is obvious, will forget what has been discovered, or will fail to protect against the danger").

The word 'known' denotes not only knowledge of the existence of the condition or activity itself, but also appreciation of the danger it involves. Thus the condition or activity must not only be known to exist, but it must also be recognized that it is dangerous, and the probability and gravity of the threatened harm must be appreciated. 'Obvious' means that both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.[31]

Thus, Defendant argues that there are no facts which would support the application of the exception in the present action.[32]

However, as with the issues of negligence in the abstract and obviousness of a given danger, Defendant's burden here remains quite substantial.  As to whether a landowner could reasonably anticipate that an invitee will fail to avoid an obvious danger, this court observed that "such issues are almost always jury issues."[33]

Viewed in the light most favorable to Plaintiff, he knew that forklifts were used in the vicinity of the mezzanine, and had seen parking spaces for them in the area.  Plaintiff testified that his primary concern while operating a forklift is to watch out for pedestrians, and that he has been trained to watch floor markings showing the direction of travel.  Photographs from the scene show yellow directional floor markings, but no warnings of overhead obstructions.  A rational fact-finder could note that Defendant had posted a yellow warning sign below the mezzanine.  The *adequacy* of that warning is a separate question, addressed below.  But for

---

[31] Restatement (Second) of Torts § 343A, cmt b, p. 219.

[32] Doc. 44, at 14-15.

[33] *See Bell v. Andler Corp.*, 1992 WL 266312, at *1 (D. Kan. 1992) (citing *Klopp v. Wackenhut Corp.* 824 P.2d 293, 298 (N. Mex. 1992). *See also, e.g., Spooner v. Todd Transp.*, 2018 WL 1281788, at *8 (D. Vt. Mar. 9, 2018) ("[b]ecause more than one rational view of the evidence exists" as to whether the defendant should have anticipated the accident, "this task is reserved for the finder of fact and is not one that court may undertake in deciding a motion for summary judgment").

present purposes, it is relevant because the warning shows some appreciation by Defendant that workers might fail to appreciate the danger of the mezzanine overhang.[34]

### C.      Did Defendant exercise due care?

Defendant argues that even if the danger was not open and obvious, it satisfied any consequent duty by placing the low clearance sign at the edge of the mezzanine. By failing it take heed of the sign, it argues, Plaintiff was primarily responsible for primary responsibility for the accident, and thus is precluded from recovery under Kansas's comparative fault statute.[35]

Whether characterized as a request to fix the proportion of fault among the parties prior to trial, of for the court to determine that the warning was adequate as a matter of law,[36] Defendant faces a burden similar to that governing its prior arguments. That is, "[r]esolving the adequacy of a warning is ordinarily a jury question."[37] The same is true for allocating fault between two negligent parties, as "determining the amount of comparative fault attributable to negligent parties is generally a question of fact in Kansas."[38] The court may compare fault only

---

[34] *See Miller*, 815 P.2d at 515 (placing flags and covering over pit "is evidence that Strickland anticipated a worker could be distracted and forget the pit was there or fail to protect himself" from its danger).

[35] K.S.A. § 60-258a (contributory negligence is not a bar to recovery where it is "less than the causal negligence of the party or parties against whom a claim is made").

[36] Defendant's brief couches the argument both ways. (Doc. 44, at 15).

[37] *Miller v. Connaught Lab'ys*, 1995 WL 579969, at *7 (D. Kan. 13, 1995). S*ee also Long v. Deere & Co.*, 238 Kan. 766, 715 P.2d 1023, 1032 (1986) (adequacy of warning was appropriate issue to be considered by jury).

[38] *Rogers v. Board of Com'rs of Shawnee Cty. ex rel. Shawnee Cty.*, 2015 WL 1514019 (Kan.Ct.App. 2015) (citation omitted). *See also Figger v. Old West Livestock*, 2013 WL 6229367, at *2 n. 1 (D. Kan. 2013) (while it is "improbable that the jury, if it decides Plaintiff crossed the center line, will nevertheless find Defendant more than 50% at fault for failing to avoid the collision … these are questions for the jury").

where "the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice."[39]

Defendant's argument rests on two cases, that of Judge Rogers in *Robison v. United States,*[40] and a decision by the Oklahoma Supreme Court. Both cases, however, are sufficiently different in their facts as to supply little support for an award of summary judgment.

The plaintiff in *Robison* was injured when he tried to step from his truck directly onto a postal loading dock. The court concluded that "even assuming arguendo that the dock was in a dangerous condition, we believe the condition was obvious to plaintiff and that plaintiff must be considered primarily at fault for failing to take a reasonable alternative to avoid the danger."[41] The court, however, noted several facts which distinguish the case. The loading dock in question was protected by a wooden bumper three inches higher than the dock, and the court stressed the extreme frequency which the plaintiff, a bulk mail hander, passed the bumper. Based on the amount of deliveries, the court concluded that the plaintiff had stepped directly from his truck onto the dock "countless times."[42]

The Defendant here has emphasized the number of times Plaintiff was in its facility. But those visits occurred over the course of many years. It is uncontroverted that Defendant's facility is very large, and there is no evidence that in these prior visits the Plaintiff was ever in

---

[39] *Martell v. Driscoll*, 297 Kan. 524, 302 P.3d 375 (2013) (internal quotation and citation omitted)..

[40] 746 F. Supp. 1059, 1066 (D. Kan. 1990).

[41] *Id*.

[42] *Id*. at 1061.

- 16 -

the area of the mezzanine.  There is certainly no evidence, as in *Robison*, that Plaintiff directly observed an obvious danger on a daily basis.

Moreover, Defendant's reliance on *Robison* is misplaced for an even more fundamental reason: the court in that case did not determine the plaintiff was primarily at fault on summary judgment. Rather, the opinion reflects the decision of the court as a fact finder allocating fault after a bench trial.[43]  Accordingly, the case supplies no support for Defendant's motion.

Defendant also analogizes this case to the decision of the Oklahoma Supreme Court in *Scott v. Archon Group*,[44] in which the court affirmed an award of summary judgment against plaintiff claiming he was injured when he drove his truck under a height clearance beam. Both cases do involve an attempt to drive a vehicle under an obstacle, but there the resemblances largely end.

In *Scott*, a 9-foot high steel clearance beam was placed to prevent trucks for the specific purpose of preventing trucks from driving onto the upper deck of a building parking lot. The plaintiff was employed in the building, and had driven into the lot "on a daily basis for more than two years."[45]  At the time of the accident, the plaintiff was not driving his normal vehicle, but a U-Haul truck, which had "[a] warning sign prominently displayed on the dashboard read[ing] '11 foot Clearance Requirement' and a similar warning sign was on the outside of the truck where

---

[43] *See Bell v. Andler Corp.*, 1992 WL 266313, at *2 (distinguishing *Robison* on this basis, and observing that because "we are proceeding upon a motion for summary judgment [w]e must still look at the facts in a light most favorable to plaintiff").

[44] 2008 OK 45, 191 P.3d 1207 (2008).

[45] 191 P.3d at 1210.

- 17 -

the driver could see it in the rear view mirror."[46]   The steel clearance beam was 12 feet long, weighed 1,843 pounds, and "had lettering on the side facing oncoming traffic which was ten inches high and clearly visible, reading:  'NO TRUCKS VISITOR PARKING CLEARANCE 8′6″.'"[47]   The court concluded that "[r]easonable people could not differ over the fact that the twelve foot steel beam with letters ten inches high warning of the height clearance requirement was an open and obvious danger."[48]

In comparison to the present action, the 10-inch warning letters in the Oklahoma case were larger both in absolute terms and in relation to the available clearance.  The 10-inch letters in *Scott* were a full 9.2% the size of the maximum clearance height.  There is no direct evidence of the dimensions of the low clearance warning in the present action, but an examination of the photographs suggest that the lettering on the sign may have been as small as two inches, or 1.4% the size of the available clearance.

In *Scott*, the clearance gap was nearly twice as great, as the plaintiff attempted to operate a U-Haul truck some 22% higher than the available clearance.  The forklift in the present action was 13% higher than the available clearance. Further, the "NO TRUCKS" warning in *Scott* categorically prohibited the type of vehicle the plaintiff was driving, regardless of height.  The warning also gave specific information as to minimum required clearance.  The warning here gave no such specifics, and did not categorically exclude forklifts from the area.  As noted earlier, other forklifts were used in the vicinity of the mezzanine. In *Scott*, the plaintiff had

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 1213.

driven under the clearance warning on a daily basis for years.  Here, the evidence shows only that Plaintiff had been somewhere in Defendant's huge facility on prior occasions.  There is no evidence he had worked in the area of the mezzanine before.

Defendant relies on two photographs from the investigation by Plaintiff's employer, which do show that the forklift does not fit under the mezzanine, and that it gave some notice of a low clearing.  But given the controlling legal standard, the Court cannot determine as a matter of law that the low clearance sign entirely fulfilled any duty of due care by Defendant, or that it necessarily rendered Plaintiff primarily at fault for the accident.

There is evidence from which a jury *could* determine that the danger from the mezzanine was open and obvious, that the warning was adequate, or that Plaintiff was primarily at fault. But the evidence not so strong that a jury must reach those conclusions.

### D.     Liability of Viega, Inc.

Defendant Viega, Inc. seeks summary judgment on the grounds that, although it is the parent and owner of Defendant Viega L.L.C., it did not itself own or operate the facility where the accident occurred.  "To hold a defendant liable for failure to keep premises in a reasonably safe condition, the defendant must be the owner, occupier, or possessor of the premises."[49]

In opposing the motion, Plaintiff points to a decision in which the court denied summary judgment by a parent of the premises owner.[50]   In that case, the plaintiff was injured as a consequence of renovations at a Marriott Courtyard hotel.  Marriott International sought

---

[49] *Miller*, 249 Kan. at 41.

[50] *Scherr v. Marriott Internat'l*, 2010 WL 4167487 (N.D. Ill. 2010) (applying Kansas law).

summary judgment on the grounds that it was its subsidiaries which owned and operated the premises (Couryard Management) where the accident occurred, or which oversaw the renovation (Marriott International Designed and Construction Services, Inc. (MIDCS)).   In denying summary judgment, the court noted evidence showing that an "employee [of the parent company] received an 'ADA Analysis Summary' relating to the renovation project," and that this employee "admitted to involvement in the hotel renovation projects as an agent of both Marriott International and MIDCS."[51]

There is no such evidence here.   Plaintiff has pointed to nothing beyond the fact that Viega, Inc. and Viega, LLC share a registered agent, and have designated the same individual as the corporate representative.   Plaintiff has not presented evidence of any conduct by Viega Inc. which would go beyond its status as the mere parent of Viega, L.L.C.   Nor is there evidence that any Viega Inc. employee participated in the design or operation of the premises in question. "Control of the property to some degree is essential because a party cannot be held liable for injuries caused by dangerous conditions on the premises unless the party has the ability to remedy the dangerous conditions."[52]   Accordingly, Viega, Inc. is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment (Doc. 43) is **DENIED IN PART** and **GRANTED IN PART**, as provided herein.

---

[51] *Id*. at *8.

[52] *Wagoner v. Dollar Gen. Corp.*, 955 F.Supp.2d 1220, 1227 (D. Kan. 2013).

**IT IS SO ORDERED.**

Dated this 25th day of January, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE